IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
|      Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  13-10196-01, 02 EFM |
| | ) | |
| JACOB ENGSTROM, and | ) | |
| TESSA BOWLER, | ) | |
|      Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF
MOTION TO SUPPRESS**

Facts

On February 22, 2012, at approximately 10:27 AM, Sedgwick County Deputy Matthew Hall and Deputy Howard Edwards were at the Day's Inn at 4875 S. Laura. The reports prepared by the officers from the incident provide the information contained below.  The deputies were following up on information received about narcotics activity in the area of the motels at 47th and Broadway.  While driving the parking lot of the Day's Inn, they saw a 1999 white Toyota Solara belonging to defendant Tessa Bowler parked on the south end of the lot.  Deputy Hall ran the tag and found the vehicle registered to Tessa Bowler.  He called the records department for a records' check, and was advised that Ms. Bowler had a November 2011 arrest for sale of narcotics and sale of marijuana, and had a 2008 arrest for sale of marijuana.

Deputy Hall was looking for Jacob Engstrom, the co-defendant in this case, because he had received information that he was possibly staying in the motels in the 47th and Broadway area and on E. Kellogg and was supposed to be selling methamphetamine out of motels and dealing in stolen cars.   He asked for an E-Justice check on Ms. Bowler, and was advised that she

1

was identified as a witness in a case in which Mr. Engstrom was a suspect in a case from two weeks earlier where he had allegedly threatened someone with a handgun.

Deputy Hall went inside and pulled the hotel register, and was advised by the clerk that Ms. Bowler had rented the room on February 21, 2012, and before his arrival, had come to the office and paid for a second night at the room.  He was advised that Ms. Bowler had mentioned the word "we" when she told that clerk that she would be leaving the room soon, and that the staff could clean the room once they were gone.   The hotel register indicated that Ms. Bowler had paid cash for one adult. The clerk advised that she was staying in the Jacuzzi suite.

At approximately 11:15AM, the deputies saw a male, later identified as Jacob Engstrom, walk from around the south end of the hotel building and walk around to the passenger side of the Toyota.  The male walked to the passenger door stood there for several seconds, and then walked back in the direction from which he had come.  About a minute later, the man returned. He was wearing a black coat.  A little later, a female walked from around the corner and went to the driver's side of the Toyota.  At the same time, the hotel clerk telephoned Deputy Hall and informed him that the woman who had registered at the room under the name Tessa Bowler had just walked out of the motel.

The officers watched Ms. Bowler get into the driver's side of the vehicle and the male open the passenger door.  The male pulled his coat off and laid it on what the officer believed was the backseat of the car, and then got into the car.

The car backed out and headed north through the parking lot, and turned onto Laura and headed north on Laura.  Deputy Hall's report states that as the car passed their car which he concluded was parked approximately 75 feet away, he noticed that Ms. Bowler did not have her seatbelt on.  The report indicates that at the time he saw this, the car was coming directly at the

deputies before turning back northbound towards 47th street.  Deputy Edwards' report does not indicate that he saw that a seatbelt was not being used by the driver as it drove towards them.

The deputies then traveled onto Laura Street behind the Toyota, and Deputy Hall indicated that he saw again that the driver's seatbelt was hanging down beside the B-pillar and was not pulled across the female.  He noticed that the male had his seatbelt on.

Deputy Edwards' report states that while they were sitting behind the Toyota at 47th South and Laura, he saw that Ms. Bowler was not wearing a seatbelt, and that the seatbelt was hanging next to the B post and not angled across the driver as if it were being worn.

After the car in front of the Toyota turned, the Toyota then signaled to turn left and turned left on 47th Street going west.  The deputies then turned westbound on 47th to follow the car, and then Deputy Hall activated his emergency equipment for the car to pull over. As this was happening, the videotape reveals that one of the officers stated that the driver, Ms. Bowler, had her seatbelt on.   Hall's report states that as the car pulled over, it continued on to the on ramp to northbound interstate 135 before coming to a stop.  Hall's report indicates that the car took "…a little bit longer than normal…" for the car to pull over, which he concluded was "…somewhat suspicious."

A videotape of the car stop provided as discovery by the prosecution reveals that at the 11:21:01AM point in the tape, the white Toyota started into the intersection to turn onto 47th Street.  The deputies' car started into the intersection at 11:21:03.   The Toyota turned onto 47th and was in the inner lane of 47th Street at 11:21:06, at which time it had completed the turn.  The deputies' car was in the inner lane of 47th Street at 11:21:07, at which time it had completed the turn.  The Toyota, started to make its way to pulling over in response to the emergency

equipment by moving into the outer, right hand lane at 11:21:11, and started pulling onto the shoulder of the road at 11:21:16.  At 11:21:23, the Toyota had come to a complete stop.

Deputy Hall turned on his emergency equipment at some point after 11:21:03, when his car started into the intersection before turning, and before 11:21:07 when it had completed the turn, and the Toyota started to work its way over to the side of the road at 11:21:11.   It took at the very most 8 seconds, and possibly as little as 4 seconds, for the Toyota to start working its way to finding a safe place to pull over on a road in which traffic was heavy.

Deputy Hall approached the parked Toyota, and Deputy Edwards went to the passenger side of the car.  Deputy Hall asked Ms. Bowler for her driver's license, and car insurance, which she provided.   Deputy Hall's report states that Ms. Bowler appeared nervous, was slow to respond to questions, kept looking at Mr. Engstrom as she was answering his questions, and did not maintain eye contact with him.  Mr. Engstrom did not have his ID with him, but provided his name, and other information to the deputies.

Deputy Hall informed Ms. Bowler that the reason he stopped her car was because she did not have a seatbelt on. He asked if there was a reason she did not have it on.  A response cannot be heard on the videotape.

Deputy Hall asked Ms. Bowler and Mr. Engstrom where they were headed, and she responded that they were going to get cleaned up.   When Deputy Hall commented that it seemed unusual to him, and he asked if they were coming from a hotel, Ms. Bowler confirmed that they had come from a hotel.  Mr. Engstrom responded that their clothes were at the "crib."

Deputy Hall asked Ms. Bowler why they were staying at the motel, and she responded that they were celebrating.   Deputy Hall and Edwards then returned to their car.  Deputy Edwards ran Ms. Bowler and Mr. Engstrom's names through SPIDER, and ran them both for

warrants.  Deputy Hall requested that a canine come to the location.  SPIDER indicated that both subjects were not wanted, confirmed that Ms. Bowler's driver's license was valid, and confirmed Mr. Engstrom's identity.

The deputies returned to the Toyota, and Deputy Hall asked Ms. Bowler to get out of the car. He returned her driver's license and insurance, and asked her why she did not have her seat belt on.  Ms. Bowler responded that she had she was putting it on, getting ready, and had just gotten into the car. Deputy Hall then told her that he was not going to give her a ticket, but a warning instead, and that she was free to go.

Deputy Hall then asked Ms. Bowler if she minded if he asked her a few questions.  She replied that she did not.  He asked her if she ever used illegal narcotics, and Ms. Bowler replied that she did not want to answer the question.  Deputy Hall asked if there was anything illegal in the vehicle, and she responded that there was not.  He asked if she had a problem with them searching the car, and she replied that she did not think that was necessary.

The videotape shows that Deputy Hall then instructed Ms. Bowler to step back from the Toyota, and informed her that a drug dog would arrive shortly, and that she and Mr. Engstrom were being "detained for the canine."  Deputy Hall told Ms. Bowler that he was detaining her because she and Mr. Engstrom had a couple of recent arrests for methamphetamine and marijuana, and that they had come from an area that is known to have a large volume of narcotics activity.   He informed Ms. Bowler that at that time, he had reasonable suspicion to detain her and Mr. Engstrom.  He told her that if the drug dog did not alert on the vehicle, she would be free to go.

Deputy Hall then asked Ms. Bowler how long it had been since she had used methamphetamine.  She replied, "a while."  He then asked how long a while was.  She replied,

"six months." He asked her how long she had known Jacob Engstrom. She replied that they had been friends for a long time. He asked about Mr. Engstrom being involved in a shooting that she was present for. She replied that she did not know about it. He asked her if she was Mr. Engstrom's girlfriend, and she replied that she was not. He asked her again about a shooting incident involving Mr. Engstrom, and she once again denied knowing anything about such an incident. Deputy Hall pursued the matter again, saying that she was listed as a witness. She responded that she had no idea what he was talking about. Deputy Hall was later advised by another officer at the scene that the incident had not involved a shooting.

Deputy Hall asked Ms. Bowler why she and Mr. Engstrom were staying at the motel. She replied that it was their anniversary. Deputy Hall mentioned that he was confused, because she had stated that she was not Mr. Engstrom's girlfriend. He asked her where she lived, and she gave him her address. He asked her which hotel they were staying at, and she replied the Day's Inn. He asked if she lived with Mr. Engstrom, and she shook her head no. He asked how long she had known Mr. Engstrom, and she responded a long time. Deputy Hall asked her if she knew Mr. Engstrom from "the game," or "before the game." She responded before the "game."

Deputy Hall asked Ms. Bowler if she had anything in her pockets, and she replied no. He requested permission to search her pockets, and she consented. No contraband was found.

Deputy Hall then asked the other deputy to have Mr. Engstrom step out of the car. He was brought away from the Toyota. Deputy Hall asked if there were any weapons were in the car. No response can be heard in the videotape.

Twenty minutes after Deputy Hall first spoke with the defendants after he had pulled over the Toyota, the drug dog and handler, Deputy Cocking, arrived. The handler deployed the dog onto the Toyota to search for drugs. The dog ran around the car, sniffing, as it proceeded. The

dog then jumped through an open window into the car.  After remaining in the car for a while, the dog then jumped out of the car window.

Deputy Hall then talked with Mr. Engstrom about his prior contacts with law enforcement. After the dog completed its search of the car, Deputy Hall informed the officers that he was going to detain Ms. Bowler.  He then informed Ms. Bowler and Mr. Engstrom that the canine officer informed him that the dog alerted to the presence of drugs in the vehicle.  He informed them that they were not under arrest at that time.  He stated that he was just placing them in handcuffs for their safety and his until they conducted the search of the vehicle.

Ms. Bowler stated that the dog had not alerted on anything in the car. One of the deputies replied that the dog had alerted on the car.  The deputies then searched the Toyota.  They found a Sig Sauer handgun located between the passenger seat and the center console, which had been stuffed down between the seat and the console.  It had been loaded with approximately nine rounds in the magazine, but the chamber was empty.  Ms. Bowler is not charged with any offenses related to the gun.

Deputy Cocking searched a purse resting on the center console of the vehicle, in which he found a digital scale. He also found a glass pipe with methamphetamine residue and a small, black zipper pouch in an outside pouch of the purse.  When he unzipped the pouch, he found a magnetic spare key container, in which he discovered a clear plastic baggie which contained a small amount of crystal substance which he identified as methamphetamine. The package weighed approximately 3.3 grams (lab test later confirmed net weight of 2.23 grams), which later field tested positive for methamphetamine.

Deputy Hall searched the black coat found on the back seat of the car.  In the inside left pocket, he found two large baggies of methamphetamine, which weighed together as 80 grams,

(lab test later confirmed combined net weight of 78.13 grams), and both baggies filed tested positive for methamphetamine.  Deputy Edwards found in the trunk a glove and a bag which contained Ziploc baggies similar to those containing the drugs.  Ms. Bowler stated that the search was illegal, and one of the deputies replied that it was not.

The drug dog was brought back to the Toyota a second time, and jumped into the open passenger door.  The dog then left the car, and the dog handler had the dog inspect the car again. The officer attempted to draw the dog's attention to the coat which contained the two packages of drugs, which had been placed on the top of the car, but the dog was not interested.  Ms. Bowler commented that the dog was not alerting.

The car was then removed from the scene and impounded.  Mr. Engstrom was escorted to the police station, where he was searched.  $1,136 was found in the front left pocket of his jeans. Mr. Engstrom informed Deputy Hall that the money was from a truck he had sold, and a tax return. The money was seized.

Ms. Bowler was taken back to the hotel, where she consented to a search of the hotel room she had stayed in, and no items of significance were found in the room.  Ms. Bowler was then transported to the Investigations office downtown, and then escorted to the Sedgwick County Jail, where she was booked and incarcerated.

Argument and Authorities

Standing

Law enforcement authorities during their investigation in this case determined that Tessa Bowler was the owner of the 1999 white Toyota Solara that was stopped and searched on February 22, 2012 as she drove it.  For the duration of a traffic stop, a police officer effectively seizes everyone in the vehicle, the driver and all passengers.  Therefore, both the driver and

8

passenger have standing to challenge the constitutionality of the initial stop. United States v. White, 584 F.3d 935 (10th Cir. 2009).

To establish standing to challenge a car search, the defendant bears the burden of showing a legitimate possessory interest in or a lawful control over the car. United States v. Valdez Hocker, 333 F.3d 1206 (10th Cir. 2003). In this case, the authorities confirmed that Tessa Bowler was the registered owner of the car. Thus, Ms. Bowler has standing to challenge the search of the car, as well as the stop of the car.

## Burden of Proof

The government bears the burden of proof to justify warrantless searches and seizures. United States v. Maestas, 2 F.3d 1485, 1491 (10th Cir. 1993). Stopping an automobile and detaining its occupants constitutes a seizure within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the detention quite brief. United States v. Gregory, 79 F.3d 973, 977 (10th Cir. 1996). Once a defendant establishes or obtains concessions as to his standing, the burden shifts to the Government to show that the officers' warrantless search and seizure was reasonable. United States v. Carhee, 27 F.3d 1493 (10th Cir. 1994).

## The Authorities Did Not Have Reasonable Suspicion to Stop Tessa Bowler's Car

The stop in this case was based upon the violation of driving without a seatbelt. The reasonableness of a traffic stop is reasonable under the Fourth Amendment "if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." United States v. Villa, 589 F.3d 1334, 1339 (10th Cir. 2009). The reasonableness of the traffic stop is examined under a two-part test set forth in Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968): first, "…whether the officer's action was justified at its inception; and second, whether it was

reasonably related in scope to the circumstances which justified the interference in the first place." Gregory, 79 F.3d at 977.  As the Tenth Circuit Court of Appeals held in United States v. Botero-Ospina, 71 F.3d 783 (10th Cir. 1995):

> [A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation has occurred or is occurring.  It is irrelevant, for purposes of Fourth Amendment review, "whether the stop in question is sufficiently ordinary or routine according to the general practice of the police department or the particular officer making the stop."  Ferguson, 8 F.3d at 391.  It is also irrelevant that the officer may have had other subjective motives for stopping the vehicle.  Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated "any one of the multitude of applicable traffic and equipment regulations" of the jurisdiction. Delaware v. Prouse, 440 U.S. 648, 661, 59 L. Ed. 660, 99 S. Ct. 1391 (1979).  To the extent that our decision in United States v. Guzman, 864 F.2d 1512 (10th Cir. 1988), is inconsistent with this holding, it is overruled….This new standard more effectively promotes an objective assessment of police officers' actions, as required by the Supreme Court. Botero-Ospina, 71 F.3d at 787.

The Botero-Ospina  decision continued:

> We leave intact the vast body of law which addresses the second prong of the Terry analysis—whether the police officer's actions are reasonably related in scope to the circumstances that justified the interference in the first place.  Our well-developed case law clearly circumscribes the permissible scope of an investigative detention….Therefore, if an officer's initial traffic stop, though objectively by the officer's observation of a minor traffic violation, is motivated by a desire to engage in an investigation of more serious criminal activity, his investigation nevertheless will be circumscribed by Terry's scope requirement. Botero-Ospina, 71 F.3d at 788.

The court found that based upon the findings that Botero-Ospina's vehicle was traveling well below the posted speed limit and straddling the lane as it traveled, the officer was able to articulate specific facts which gave rise to a reasonable suspicion that Mr. Botero-Ospina may have been driving under the influence of alcohol, in violation of Utah law, and was justified in stopping Botero-Ospina's car.  Finally, the court noted, "It is likewise irrelevant that Deputy Barney may have harbored a secret hope of finding evidence of drug trafficking."

In Terry v. Ohio, the Supreme Court noted that in order to assess the reasonableness of the officer's conduct as a general proposition, it is necessary "first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen," for there is "no ready test for determining reasonableness other than balancing the need to search [or seize] against the invasion which the search [or seizure] entails." Terry, 392 U.S. at 20-21.

When applying the legal standards described above to the factual circumstances of this case, Deputy Hall stopped the car Ms. Bowler was driving because he believed that she had been driving the car without having her seatbelt fastened, after viewing her in the moving car from 75 feet away and further, and then again when his police car was behind her car while it was stopped at a stop sign.   However, after he made that initial determination, before he stopped the car in which she was driving, he observed, and stated in the videotape, that she had her seatbelt on.   As in the Botero-Ospina case, the deputies' suspicions that Ms. Bowler or Mr. Engstrom might have drugs in the car, including information from informants, were irrelevant. The basis for the traffic stop was the alleged seatbelt violation. The statement in Deputy Hall's report that Ms. Bowler's car took a little bit longer than normal to pull over, and was somewhat suspicious is not supported by review of the videotape, which shows the heavy traffic on the street in which Ms. Bowler's car traveled right before it stopped within seconds of direction from Deputy Hall.

Further, as the U.S. Supreme Court noted in Delaware v. Prouse, 440 U.S. 648, at 662, 99 S.Ct. 1391, 59 L.Ed. 2d 660 (1979), an individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation.   People are not shorn of all Fourth Amendment protection

when they step from their homes onto the public sidewalks, nor are they shorn of those interests when they step from the sidewalks into their automobiles. Prouse, 440 U.S. at 663.

Tessa Bowler respectfully asserts that the need for government intrusion by stopping a car where a suspect  may or may not have been traveling without her seatbelt fastened for a short period of time before then traveling with the seatbelt fastened does not meet the requisite balancing test of Mapp when measured against the Fourth Amendment right of a traveler to a reasonable expectation of privacy, and to be free from government intrusion when probable cause has not been established that a crime has been committed.  Further, Ms. Bowler requests that this Court carefully review evidence presented by the prosecution to determine whether it has met its burden of establishing that it had reasonable suspicion to believe that Ms. Bowler was not driving with her seatbelt on, after having viewed the car from 75 feet away and further, and then from behind the car.

The Authorities Did Not Have Reasonable Suspicion<br>to Detain Tessa Bowler Until the Drug Dog Arrived

Tessa Buller also respectfully submits that the deputies did not have reasonable suspicion to detain her until the drug dog arrived to the scene, after the deputies determined that the initial detention related to the alleged seatbelt violation was resolved.  Once the purpose of the stop is completed, further detention for purposes of questioning unrelated to the initial traffic stop is impermissible unless: (1) the officer has objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring, or (2) the initial detention has become a consensual encounter.  United States v. Cervine, 347 F.3d 865 (10th Cir. 2003).

When the two deputies returned to the Toyota, and Deputy Hall returned Ms. Bowler's driving documents to her, he asked her to get out of the car.  He then directed her away from the Toyota where Mr. Engstrom was still sitting, being watched by Deputy Edwards, and had her

stand behind the Toyota. At 11:34:09 on the videotape, he asked her why she did not have her seat belt on, a question clearly designed to elicit a response admitting guilt of a violation. At 11:34:43, he returned her driver's license, and at 11:34:46, he told her she was free to go. However, at 11:34:48, he asked her if he could ask her a further question.  She declined to answer his question of whether she had ever used illegal drugs at 11:34:59, and declined to consent when he asked her at 11:35:08 if he could search her vehicle.   He then immediately at 11:35:11 instructed her to move further away from the car, and informed her that she and Mr. Engstrom were being detained for the drug dog.  He told her that if the dog did not alert, they would then be free to go.  He told her the reasons described above that he was detaining them.

Those reasons he described--that Ms. Bowler had a couple of recent arrests for methamphetamine and marijuana, as did Mr. Engstrom, and that they had come from an area where there was a "large volume of narcotics activity," don't support an objectively reasonable and articulable suspicion that Ms. Bowler and Ms. Engstrom were committing a crime while traveling in her car. The deputies did not allege they had information that either of the defendants were believed to be committing an offense in the hotel room from which they left earlier that day.   There are no allegations that the Toyota had been involved in criminal activities.   The alleged arrests of Ms. Bowler had occurred 3 months earlier, and there are no allegations the authorities knew she was involved in criminal activity currently.

Regarding prior drug arrests of Ms. Bowler and Mr. Engstrom, the Tenth Circuit Court of Appeals in United States v. Wood, 106 F.3d 942 (10th C. 1997) stated:

> We have previously cautioned that prior criminal involvement alone is insufficient to give rise to the necessary reasonable suspicion to justify shifting the focus of an investigative detention from a traffic stop to a narcotics or weapons investigation…If the law were otherwise, any person with any sort of criminal record…could be subjected to a Terry type investigative stop by a law

enforcement officer at any time without the need for any other justification at all. <u>Wood</u>, 106 F.3d at 948.

The prosecution may choose to rely on other factors that Deputy Hall did not mention to Ms. Bowler as the factors which justified her detention for the arrival of the drug dog.  Deputy Hall had indicated that Ms. Bowler appeared nervous when answering his questions.  As noted in <u>Wood</u>, Id.:

> It is certainly not uncommon for most citizens—whether innocent or guilty—to exhibit signs of nervousness when confronted by a law enforcement officer….We have repeatedly held that nervousness is of limited significance in determining reasonable suspicion and that the government's repetitive reliance on…nervousness…as a basis for reasonable suspicion… must be treated with caution. <u>Wood</u>, 106 F.3d at 948.

Under these circumstances, since the deputies did not have reasonable suspicion to stop Tessa Bowler's car, the stop was unlawful. As a result, the continued encounter and detention of Tessa Bowler was unlawful, as well. When Deputy Hall announced that he was detaining Ms. Bowler and Mr. Engstrom, he did not have a reasonable suspicion to do so.

<u>Tessa Bowler's Statements to Deputy Hall After She Was Detained
Were Obtained in Violation of Her Fifth Amendment Rights Against Incrimination,
and Should Be Suppressed</u>

That Fourth Amendment violation was extended to include a Fifth Amendment violation immediately after Deputy Hall announced that he was detaining Ms. Bowler and Mr. Engstrom. When Deputy Hall informed Ms. Bowler that she was detained for the drug dog, he told her that she could obtain her release if the drug dog did not alert on her car after it arrived at the scene. Ms. Bowler asserts that the factual circumstances described in pages 5 and 6 above demonstrate that her <u>Miranda</u> rights were violated at that time when Deputy Hall interrogated her after detaining her.

All of these questions Deputy Hall asked on pages 5 and 6 above regarding her involvement in drug usage, her relationship with Mr. Engstrom, prior alleged criminal conduct,

and her involvement in "the game" were designed to obtain incriminating information from her that was related to his suspicions that she and Mr. Engstrom were involved in drug trafficking activity together.

The United States Supreme Court has held that "...when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." Miranda v. Arizona, 384 U.S. 436, 478, 86 S. Ct. 1602, 16 L. Ed. 694 (1966).  A confession obtained during a 'custodial interrogation' may not be used by the prosecution against the defendant unless the prosecution demonstrates the use of procedural safeguards effective to secure the Fifth Amendment privilege against self-incrimination." United States v. Chee, 514 F.3d 1106, 1112 (10th Circ. 2008).

For Miranda's protections to apply custodial interrogation must be imminent or presently occurring.  United States v. Rambo, 365 F.3d 906 (10th Cir. 2004).  Miranda is therefore only applicable when (1) the suspect is "in custody", and (2) any questioning meets the legal definition of interrogation.  United States v. Benard, 680 F.3d 1206 (10th Cir. 2012).  A person is not in custody for Miranda purposes unless his freedom of action is curtailed to a degree associated with formal arrest. Benard, Id.

Interrogation refers to either express questioning or its functional equivalent-i.e., words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.  Rhode Island v. Innis, 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

In this case, Tessa Bowler was taken away from the co-defendant, instructed to leave the protection of her car, had been separated from her purse, which contained her phone, was told

that she could not leave by a law enforcement officer, and told by him that she would only be freed if a drug dog did not alert on her car. If she had tried to leave, she would have been in direct violation of a police officer's instructions. She was effectively "in custody," for <u>Miranda</u> purposes.

Deputy Hall's questions were clearly seeking incriminating responses.  For example, he asked Ms. Bowler when she had last used drugs, and about her ties to Jacob Engstrom, a person he had been advised was selling drugs and committing other crimes. He was holding her until a drug dog arrived.  He clearly was not seeking answers about the violation of the seatbelt law; he wanted to get evidence of a drug crime against her.  "The remedy for a violation of <u>Miranda</u> or <u>Edwards</u> is straightforward; any statement given in violation of the rules cannot be introduced as substantive evidence in the state's case-in-chief."  <u>United States v. Bautista</u>, 145 F.3d 1140 (10th Cir. 1998).

Tessa Bowler's statements to Deputy Hall after her detention for the drug dog, inadmissible at trial due to the <u>Miranda </u>violation, are also excludable as "fruits of the poisonous tree" under <u>Wong Sun v. United States </u>, 371 U.S. 471, 83 S. Ct. 407, 9 L.Ed. 2d 441 (1963). The <u>Wong Sun</u> court noted that once the primary illegality has been established, the question becomes whether evidence obtained after that illegal action has been obtained by exploitation of that illegality, or instead by means sufficiently distinguishable to be purged of the primary taint. <u>Wong Sun</u>, Id.  That case also stated that policies underlying the exclusionary rule's application to the Fourth Amendment protect verbal statements of defendants, as well as the more traditional seizure of physical, tangible materials.  <u>Wong Sun</u>, Id. In this case, the detention and questioning of Ms. Bowler immediately followed the unlawful stop, and there were no intervening circumstances, nor period of time, which purged the taint. Further, Tessa Bowler's statements to

the deputies after the initial stop of the car, and before her detention awaiting the drug dog, were inadmissible as well, as "fruits of the poisonous tree."

The subsequent arrival and deployment of the drug dog, which the government will no doubt argue gave probable cause to search the car, also occurred only because the unlawful stop of the car and unlawful detention of Ms. Bowler had taken place. No intervening circumstances purged the taint.

Further, the search of the car by the deputies was also unlawful, and the items found were "fruits of the poisonous tree" as a result of the unlawful stop of the car, unlawful detention of Ms. Bowler and Mr. Engstrom, and unlawful questioning of Ms. Bowler. Once again, there were no intervening events which purged the taint of the preceding unlawful acts of the authorities. Accordingly, all evidence seized from the search of the car is inadmissible in the government's case in chief.

For the foregoing reasons, defendant Tessa Bowler requests an Order from this Court suppressing from admission into evidence in the government's case all physical evidence obtained by the authorities subsequent to the stop of the 1999 Toyota Solara driven by Tessa Bowler on February 22, 2012, as well as all statements made by her to the authorities after the initial stop of her car. She requests an evidentiary hearing regarding this motion.

Respectfully submitted,

Foulston Siefkin LLP
1551 N. Waterfront Parkway, Suite 100
Wichita, KS  67206-4466

By  /s/ Cyd Gilman
     Cyd Gilman, #09942
     cgilman@foulston.com
     Tel (direct):        316-291-9757
     Fax (direct):        866-889-9719
     *Attorney for Defendant Tessa Bowler*

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of February, 2014 I electronically filed the foregoing Memorandum in Support of Motion to Suppress with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

      */s/ Cyd Gilman*
                Cyd Gilman